Ross W. Wood, Alexander H. Grant, and Benjamin
B. Wood *v*. Moses B. Savage and Sophia his wife,
Moses Savage, William Savage, and Eurotas P.
Hastings.

A settlement after marriage, on a wife, of property belonging to her before marriage,
in pursuance of an antenuptial parole agreement, is good against creditors.

Where the property was money, and was to be invested by the husband, whenever a
favorable opportunity offered, in the purchase of real estate in the wife's name and
for her benefit, and the money was used by the husband in his business without the
wife's consent, and was not laid out in pursuance of the agreement until after the
expiration of two years, the conveyance to the wife was held to be good against
the creditors of the husband.

In November, 1838, complainants obtained a judgment
against Moses B. Savage and William Savage, as partners,
for $1,852.67 damages, and $21 costs, on which an
execution was taken out and returned unsatisfied. They
then filed their bill to have their judgment satisfied out of
equitable assets, belonging to the judgment debtors; and
a store and lot of ground in the city of Monroe, conveyed
by the judgment debtors to Moses Savage, their father,
in May, 1838; and a farm in Washtenaw county, one
undivided half of which was conveyed to Sophia, wife of
Moses B., on November 27th, 1837, by one Reighley, and
the other undivided half thereof, on June 4th, 1839, by
one Phelps. Moses B., having a life estate in the farm
as tenant by the courtesy, in May, 1840, conveyed his in-
terest therein, by quit-claim deed, to Moses Savage. The
bill charged that this last conveyance, and the conveyance
of the store and lot in Monroe, were made to defraud the
creditors of Moses B. and William Savage; and that the
deeds from Reighley and Phelps for the Washtenaw farm,
were taken in Sophia's name for a like purpose.

The defendants answered severally, denying the fraud with which they were charged, or any intention to defraud the creditors of Moses B. and William Savage. The following facts, also, appeared in the case. The consideration paid by Moses Savage for the property in Monroe, was $800 cash. Moses B. and William were, at the time, in want of money to pay some honorable or confidential debts; and the whole of the $800 was used by them for that purpose. The consideration paid for Moses B.'s life estate in the Washtenaw farm, was $700. This was also paid in cash to Moses B., and the money used by him in paying his individual debts, and the debts of the firm of M. B. & W. Savage. The Washtenaw farm was purchased with the money of Sophia, under the following circumstances. Moses B. and Sophia were married, in October, 1835, in the city of New York, where Sophia then resided. She was at that time a widow, and had one child; and, having $1,500 of her own, mostly in cash, it was agreed between Moses B. and her, on the evening of the day preceding their marriage, that he should take the $1,500, and invest it in real estate in Michigan, whenever a favorable opportunity offered, in her name, and for her benefit; and a part of the money was then handed to him, and the balance of it in a short time after their marriage. In November, 1837, Moses B., with the assent of his wife, purchased for her an undivided half of the Washtenaw farm, of Reighley, for $1,050, and paid for it; and, in June, 1839, the other half of the farm, with her approbation and consent, was purchased for her of Phelps, for $1,500, of which $500 was paid, and the balance secured by a mortgage from her to Phelps, and her promissory notes, signed by Moses B. as her surety. The notes and mortgage had not been paid.

*A. D. Fraser & A. Davidson*, for complainants.

Moses B. Savage became entitled, immediately upon his marriage with Sophia, to all of her personal property, and such *choses in action* as should be reduced to possession; and the money claimed by her as a trust fund for her benefit was in this situation. *Reeve's Dom. Rel.* 1, 161; *Clancy's Rights of Married Women*, 1; *Co. Litt.* 112, *b;* 8 *Mass. R.* 99, 229; 7 *Pick. R.* 65; 8 *Pick. R.* 218; 12 *Pick. R.* 173. And equity cannot settle the wife's property upon her, after it has been reduced to possession by the husband. 2 *McCord Ch. R.* 40; 1 *Eq. Dig. (Barb. and Harr.)* 233. The promise of Moses B. to make the settlement, being a parole promise, could not, under the statute of frauds, create him a trustee, in such manner as to sustain a settlement made long after, when he was embarrassed, and owing the debt for which this suit is brought. 1 *Story Com. on Eq.* 366–7; 1 *Strange R.* 236; 2 *Lev. R.* 146; 3 *J. C. R.* 488; 1 *J. C. R.* 343; *Laws* 1833, 302; 4 *J. C. R.* 45; 1 *Pet. R.* 460; 12 *Serg. & R.* 448; 3 *Dessaus. R.* 230; 2 *Nott & McCord R.* 544.

The deed by Moses B. to his father, of the life estate of the former in the Washtenaw farm, is fraudulent. A party can *assign*, but cannot *sell*, such an interest.

The deed of the Monroe property should be set aside for inadequacy of consideration.

*H. N. Walker*, for defendants Sophia and Moses Savage.

The rights of Sophia Savage are derived from a purchase made in pursuance of an antenuptial contract for a good and *valuable consideration other than marriage*, and with money furnished by the wife *before marriage*. Such a contract might be *enforced* against a husband in equity; and being executed cannot be set aside. *Reeve's Dom. R.*

174, *et seq.; 2 Paige R.* 303. And a husband has a right to make a reasonable settlement, even although there may be creditors at the time. *2 P. Wms. R.* 694. A clear distinction is taken in all the cases, between settlements made in consideration of *marriage only*, and others. 6 *Ves. R.* 759; 17 *Ves. R.* 271; 9 *Ves. R.* 193; 2 *Ves. R.* 18; 3 *J. C. R.* 494. The case of *Taggert* v. *Talcott*, 2 *Edw. Ch. R.* 628, is very similar to this. The portion of the property purchased from Reighley was bought before the complainants obtained their judgment, and is not affected by any claim of theirs, even if such claim could affect the rest.

The statute of frauds in existence when this agreement was made, applies only to promises *upon consideration of marriage, &c. Laws* 1833, 342.

THE CHANCELLOR. Regarding the purchase of the Washtenaw farm as a performance of the antenuptial parole agreement, and in the light of a settlement, after marriage, of the wife's property on her, in pursuance of such agreement, the question is, whether or no such settlement, made after marriage, and having nothing but the antenuptial parole agreement to support it, was fraudulent and void against the then existing creditors of the husband.

The complainants were creditors of the husband, when Phelps' undivided half of the farm was purchased, if not when the first purchase was made of Reighley.

The case of *Reade* v. *Livingston*, 3 *J. C. R.* 481, is relied on as authority against the validity of such settlements, as to existing creditors. The point, however, was not decided in that case, nor was it necessary to decide it. Chancellor Kent discussed it at some length, and intimated an opinion adverse to the validity of such settlements; but he decided there was no antenuptial contract proved, and held the settlement void in that case, on the ground of

its being voluntary, and made after marriage, by a party indebted at the time. The only difficulty he found in sustaining such settlements, was the statute of frauds. He admits that prior to the statute, such settlements were held to be good; and refers to *Griffin* v. *Stanhope, Cro. Jac.* 454, and *Sir Ralph Bovy's case*, 1 *Vent. R.* 193, in which a "settlement after marriage, in pursuance of a prior parole agreement was held good." "But," he says, "these were cases prior to the statute of frauds (29 *Charles* II.) which renders void all promises in consideration of marriage; and, therefore, since the statute, it has been determined that the agreement, to be valid, must be in writing;" and refers to the case of *Montacute* v. *Maxwell*, 1 *Str.* 236; 1 *P. Wms. R.* 618. That was a bill by a wife against her husband, for a settlement of her property on her, in pursuance of an antenuptial agreement. It was, therefore, a case clearly within the statute; but it has no bearing, that I am able to discover, on the question. It is one thing to decree the specific performance of a parole agreement, and another to declare such agreement, when executed, fraudulent and void. The statute requiring such agreement to be in writing, it seems to me, does not require such a construction. It was not made for the benefit of creditors, as the statute against fraudulent conveyances, but to prevent perjury, and secure more circumspection in entering into certain classes of contracts. In *Dundas* v. *Dutens*, 1 *Ves. R.* 196, Lord Thurlow was of opinion such settlements were good against creditors.

Such a settlement cannot be regarded as a voluntary settlement after marriage. The parole agreement, which the husband was morally, and in conscience, bound to perform, is a sufficient consideration to sustain the settlement. Such was the opinion of Lord Parker, who decided the case of *Montacute* v. *Maxwell*. In the language of Chan-

cellor Kent, "he thought, however, that if the husband, after marriage, had in writing admitted the former agreement, it might have been material, and a sufficient consideration to support a subsequent promise in writing." In many cases at law, a moral obligation, as contradistinguished from a legal liability, has been held a sufficient consideration to support a promise; and why not in equity, not to support a naked promise, but performance? If the agreement had been reduced to writing, this Court would, after the marriage, on a bill filed by the wife, have compelled the husband to lay out the $1,500 in real estate for her.

By the statute in existence when the marriage took place, (*Laws of Michigan*, 1833, *p.* 342, § 10,) no action could be brought, whereby to charge any person, upon any agreement made in consideration of marriage, unless such agreement, or some note or memorandum thereof, was in writing, and signed by the party to be charged therewith, or some person by him authorised. This part of the statute has no reference to creditors, who are not mentioned in connection with the contracts required to be in writing; much less does it declare such contracts, when not in writing, fraudulent and void against creditors. As I have already stated, it was not made for the benefit of creditors, but for an entirely different object. The husband having, of his own accord, done what he was morally bound to do, and what the Court, but for the statute, would have compelled him to do,—shall what he has done be declared fraudulent and void? I know of no case going this length; and it would, it appears to me, be a strange doctrine for a court of equity to advance, that an act, which a party was in conscience bound to do, was at the same time fraudulent and void as to creditors.

Moses B. says he was solvent, and worth between four

and five thousand dollars, when he was married; and that the fifteen hundred dollars were not immediately invested, as real estate was at the time rising in value, and could not be purchased on favorable terms. In November, 1837, two years after the marriage, the Reighley half of the farm was purchased, and paid for. This was a year before complainants obtained their judgment. In June, 1839, the other half was purchased of Phelps, $500 paid, and a mortgage executed by Sophia, and promissory notes by her and her husband, for the balance of the purchase money, which is still unpaid, and a lien upon the farm. I see nothing to induce a belief the farm was not purchased in good faith, and in execution of the antenuptial agreement. The fact that the $1,500 was used by the firm of M. B. & W. Savage, in their business, until a favorable opportunity offered for investing it in real estate, is no evidence of fraud, or of a determination on the part of Moses B. not to keep his agreement with his wife. It was used without the consent or approbation of Sophia.

As to the property in Monroe, it was sold to Moses Savage, to enable M. B. & W. Savage to pay a confidential debt. It was sold for $800, cash, at a time of great pecuniary distress, when money was scarce, and real estate a drug that could hardly be sold for cash at any price. The witnesses examined to prove its value at the time, state it was worth a thousand dollars in cash. Conceding this point, the inadequacy of price is not sufficiently great to warrant an inference of fraud. More especially, as fraud is unequivocally denied; the $800 was paid in cash, and went to pay the debts of the firm; and Moses B. states he then believed himself solvent, and able to pay all his debts.

No question is made as to the adequacy of the price paid for Moses B.'s life estate in the farm.

The bill must be dismissed, but without costs, against all the defendants except Moses B. and William Savage; against whom it may be necessary to retain it until the receiver's account of the property that has come into his hands is settled.